UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____



18 U.S.C. § 1349
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(2)(A)
18 U.S.C. § 2
18 U.S.C. § 982

FILED by _____ D.C.

OCT 0 2 2012

STEVEN M. LARIMORE
CLERK U. S. DIST CT
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA

vs.

ROGELIO RODRIGUEZ
and
RAYMOND ADAY,

                    Defendants.
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federal healthcare program providing benefits to persons who were over the age of 65 or disabled.  Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS").  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.     "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4.     Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.

5.     CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs.  CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States.  In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims. As administrator, Palmetto was to receive, adjudicate and pay, claims submitted by HHA providers under the Part A program for home health claims.

**Part A Coverage and Regulations**

**Reimbursements**

6.       The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if:

      a.       the patient was confined to the home, also referred to as homebound;

      b.       the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

      c.       the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy, and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.       HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care."   The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition.   If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence.   There were no limits to the number of episodes of home health benefits a

beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8.      In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60 day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

## Record Keeping Requirements

9.      Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10.     Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare were a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature.

Also required were a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS.

11.    Medicare Part A regulations required HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary.  The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition.  The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury.  These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

### Special Outlier Provision

12.    Medicare regulations allowed certified home health agencies to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency.  That certified home health agency would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees.

13.    For insulin-dependant diabetic beneficiaries, Medicare paid for insulin injections by an HHA agency when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary.

Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary was confined to the home or homebound and in need of home health services, as certified by a physician, were continuing requirements for Medicare to pay for such home health benefits.

14.     While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries that had the most extensive care needs, which could result in Outlier Payments to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

## Caring Nurse Home Health, Corp.

15.     Caring Nurse Home Health, Corp. (Caring HH) was a Florida corporation incorporated on or about December 18, 2003, that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care and physical therapy services to eligible Medicare beneficiaries.

16.     On or about December 18, 2003, the Articles of Incorporation filed for Caring HH listed **ROGELIO RODRIGUEZ** as President and Registered Agent.

17.     On or about March 24, 2004, **ROGELIO RODRIGUEZ** filed the 2004 For Profit Corporation Annual Report and listed the principal place of business for Caring HH as 6704 NW 72nd Avenue, Miami, Florida, 33166. On or about June 10, 2010, **RODRIGUEZ** filed

Articles of Dissolution for Caring Nurse Home Health, Corp.

18.     On or about January 22, 2007, April 30, 2008, April 29, 2009, and January 7, 2010, **ROGELIO RODRIGUEZ** filed and signed the For Profit Corporation Annual Reports for the aforementioned years for Caring HH and listed himself as President.

19.     On or about December 17, 2003, **ROGELIO RODRIGUEZ** signed a Medicare application for Caring HH in which he listed himself as the director/officer and managing employee.

20.     On or about October 29, 2004, **ROGELIO RODRIGUEZ** completed a Medicare Application for Caring HH in which he certified that he was the president of Caring HH.

21.     On or about September 14, 2005, Caring HH obtained Medicare provider number 10-8188, authorizing Caring HH to submit claims to Medicare for HHA-related benefits and services.

22.     On or about October 17, 2005, **ROGELIO RODRIGUEZ** completed and signed the Medicare Electronic Data Interchange Enrollment Agreement for Caring HH listing himself as President.

23.     On or about February 10, 2010, **ROGELIO RODRIGUEZ** signed the revised Electronic Funds Authorization Agreement for Caring HH and Medicare, in which he stated that he was the president.

24.     From in or around January 2006, through in or around January 2010, Caring HH submitted claims to the Medicare program for approximately $51 million in home health services that Caring HH purportedly provided to approximately 965 beneficiaries. As a result of the submission of these claims, Medicare, through Palmetto, paid approximately $31 million to Caring HH.

## Good Quality Home Health Care, Inc.

25.     Good Quality Home Health, Inc. (Good Quality HH) was a Florida corporation incorporated on or about February 7, 2008, that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care and physical therapy services to eligible Medicare beneficiaries.

26.     On or about March 12, 2010, **RAYMOND ADAY** amended the 2010 For Profit Corporation Annual Report for Good Quality HH, listing himself as President, Vice President, Director and Registered Agent.  On or about December 6, 2010, the Articles of Incorporation for Good Quality HH were amended and signed by **ADAY** listing himself as President and new Registered Agent.

27.     On or about February 18, 2011, **RAYMOND ADAY** filed the 2011 For Profit Corporation Annual Report for Good Quality HH, listing the principal place of business for Good Quality HH as 2100 West 76th Street, Suite 406, Hialeah, Florida, 33016.

28.     On or about May 11, 2009, Good Quality HH obtained Medicare provider number 10-9198, authorizing Good Quality HH to submit claims to Medicare for HHA-related benefits and services.

29.     On or about September 10, 2009, **RAYMOND ADAY** signed the Medicare Application indicating that he was the owner, Managing Employee, Director and Officer of Good Quality HH.

30.     From in or around October 2009, through in or around June 2011, Good Quality HH submitted claims to the Medicare program for approximately $1.5 million in home health services that Good Quality HH purportedly provided to approximately 338 beneficiaries.  As a result of the submission of these claims, Medicare, through Palmetto, paid approximately $2.1

million to Good Quality HH.

### Defendants

31.      Defendant **ROGELIO RODRIGUEZ,** a resident of Miami-Dade County, Florida, was President of Caring HH. **RODRIGUEZ** was also an owner and operator of Caring HH. **RODRIGUEZ** also controlled Good Quality HH.

32.      Defendant **RAYMOND ADAY,** a resident of Miami-Dade County, Florida, was an office administrator at Caring HH.  **ADAY** was also an owner and operator of Good Quality HH.

### COUNT 1
#### Conspiracy to Commit Health Care Fraud
#### (18 U.S.C. § 1349)

1.      Paragraphs 1 through 32 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From in or around January 2006, and continuing through in or around June 2011, the exact dates being unknown to the Grand Jury, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

### ROGELIO RODRIGUEZ
### and
### RAYMOND ADAY,

did knowingly and willfully combine, conspire, confederate and agree with Martha Roa, Juana Rivas and others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care

benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

## PURPOSE OF THE CONSPIRACY

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) causing the submission of false and fraudulent claims to Medicare; (b) offering and paying kickbacks and bribes to Medicare beneficiaries for the purpose of such beneficiaries arranging for the use of their Medicare beneficiary numbers by the co-conspirators as the bases of claims filed for home health care; (c) causing the concealment of the submission of false and fraudulent claims to Medicare, the receipt and transfer of proceeds from the fraud, and the payment and receipt of kickbacks; and (d) causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## MANNER AND MEANS

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4.      **ROGELIO RODRIGUEZ** owned and controlled Caring HH and Good Quality HH.

5.      **RAYMOND ADAY** owned and controlled Good Quality HH and worked at Caring HH as an office administrator.

6.      **ROGELIO RODRIGUEZ, RAYMOND ADAY** and their co-conspirators paid kickbacks to co-conspirator patient recruiters for recruiting Medicare beneficiaries to be placed at Caring HH and Good Quality HH, which billed Medicare for home health services that were not medically necessary and/or were not provided.

-10-

7.   **ROGELIO RODRIGUEZ, RAYMOND ADAY** and their co-conspirators paid kickbacks to co-conspirator patient recruiters, who paid kickbacks to Medicare beneficiaries in exchange for the beneficiaries signing documents stating that they had received the home health care services that were billed to Medicare, when, in fact, the home health care services were not provided and/or were not medically necessary.

8.   **ROGELIO RODRIGUEZ, RAYMOND ADAY** and their co-conspirators negotiated kickback rates for the patient recruiters to be paid by the co-conspirator owners and operators of Caring HH and Good Quality HH.

9.   **ROGELIO RODRIGUEZ** and his co-conspirators sent patient recruiters and Medicare beneficiaries to co-conspirator doctors to obtain prescriptions for home health services and signed POCs for services that were not medically necessary.

10.   **ROGELIO RODRIGUEZ** and his co-conspirators obtained fraudulent prescriptions and POCs from physicians for Medicare beneficiaries for home health and therapy services that were not medically necessary.

11.   **ROGELIO RODRIGUEZ, RAYMOND ADAY** and their co-conspirators distributed kickback payments to the patient recruiters on behalf of Caring HH and Good Quality HH.

12.   **ROGELIO RODRIGUEZ** and his co-conspirators caused patient files and POCs to be falsified to make it appear that Medicare beneficiaries qualified for and received home health services that in reality were not medically necessary and/or not provided.

13.   **ROGELIO RODRIGUEZ, RAYMOND ADAY** and their co-conspirators used medical billers to submit false and fraudulent claims to Medicare on behalf of Caring HH and Good Quality HH.

14.    **ROGELIO RODRIGUEZ, RAYMOND ADAY** and their co-conspirators caused the submission of approximately $53 million in false and fraudulent claims to Medicare under the provider number of Caring HH and Good Quality HH, seeking payment for the costs of home health services, including but not limited to diabetic injections, skilled nursing visits, physical therapy, and other treatments and services, that were not medically necessary and were not provided.

15.    As a result of these false and fraudulent claims, Medicare paid Caring HH and Good Quality HH approximately $33 million.

16.    **ROGELIO RODRIGUEZ, RAYMOND ADAY** and their co-conspirators used the money fraudulently obtained from Medicare for their personal benefit, and to further the fraud, including through the payment of kickbacks to their co-conspirators.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Pay Health Care Kickbacks
### (18 U.S.C. § 371)

1.    Paragraphs 1 through 32 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    From in or around January 2006, and continuing through in or around June 2011, the exact dates being unknown to the Grand Jury, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**ROGELIO RODRIGUEZ**
**and**
**RAYMOND ADAY,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate and agree with Martha Roa, Juana Rivas, and others known and

-12-

unknown to the Grand Jury, to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a federal health care program, that is, Medicare.

## PURPOSE OF THE CONSPIRACY

3.      It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (1) paying kickbacks to ensure that Medicare beneficiaries would serve as patients at Caring HH and Good Quality HH; and (2) submitting claims to Medicare for home health services that the co-conspirators purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

4.      **ROGELIO RODRIGUEZ** and **RAYMOND ADAY** offered and paid kickbacks to co-conspirator patient recruiters in return for their referring Medicare beneficiaries to Caring HH and Good Quality HH for home health and physical therapy services.

5.      **ROGELIO RODRIGUEZ, RAYMOND ADAY** and co-conspirators offered and paid kickbacks to Medicare beneficiaries in order to induce them to serve as patients for Caring HH and Good Quality HH regardless of their medical condition.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one of the co-conspirators committed and caused to be committed in the Southern District of Florida at least one of the following overt acts, among others:

1.      On or about April 30, 2008, **ROGELIO RODRIGUEZ** filed the 2008 For Profit Corporation Annual Report for Caring HH.

2.      On or about August 25, 2008, **ROGELIO RODRIGUEZ** obtained signatory authority for a corporate bank account of Caring HH, Bank of America account number ending in #8044.

3.      On June 6, 2009, **RAMOND ADAY** deposited Check #8681 in the approximate amount of $2,555 into Washington Mutual Bank.

4.      On or about February 18, 2011, **RAYMOND ADAY** filed the 2011 For Profit Corporation Annual Report for Good Quality HH, listing the principal place of business for Good Quality HH as 2100 West 76th Street, Suite 406, Hialeah, Florida, 33016.

5.      In or around 2011, **RAYMOND ADAY** issued a Good Quality HH 1099-MISC Internal Revenue Service Form to a conspirator that documented a kickback payment of approximately $3,500 that **ADAY** previously made to that conspirator.

6.      On or about October 26, 2009, **ROGELIO RODRIGUEZ** paid a kickback to a co-conspirator via Caring HH check No. #14775, drawn on Caring HH's corporate account at Bank of America, in the approximate amount of $4,500.

7.      On or about November 16, 2009, **ROGELIO RODRIGUEZ** paid a kickback to a co-conspirator via Caring HH check No. #15613, drawn on Caring HH's corporate account at Bank of America, in the approximate amount of $9,000.

8.      On or about November 16, 2009, **ROGELIO RODRIGUEZ** paid a kickback to a co-conspirator via Caring HH check No. #15614, drawn on Caring HH's corporate account at Bank of America, in the approximate amount of $4,000.

9.      On or about December 1, 2009, **ROGELIO RODRIGUEZ** paid a kickback to a co-conspirator via Caring HH check No. #16269, drawn on Caring HH's corporate account at Bank of America, in the approximate amount of $3,500.

10.     On or about December 8, 2009, **ROGELIO RODRIGUEZ** paid a kickback to a co-conspirator via Caring HH check No. #16913, drawn on Caring HH's corporate account at Bank of America, in the approximate amount of $5,000.

All in violation of Title 18, United States Code, Section 371.

**COUNTS 3-7**
**Payment of Kickbacks in Connection with a Federal Health Care Benefit Program**
**(42 U.S.C. § 1320a-7b(b)(2)(A))**

1.      Paragraphs 1 through 32 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates enumerated below as to each count, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ROGELIO RODRIGUEZ,**

did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, in cash and in kind, that is, in the form of checks, as indicated below, directly and indirectly, overtly and covertly, to a person to induce such person to refer an individual for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by Medicare as set forth below:

-15-

| Count | Approximate Date | Approximate Kickback Amount |
|:-----:|:----------------:|:---------------------------:|
| 3 | October 26, 2009 | $4,500 |
| 4 | November 16, 2009 | $4,000 |
| 5 | November 16, 2009 | $9,000 |
| 6 | December 1, 2009 | $3,500 |
| 7 | December 8, 2009 | $5,000 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18, United States Code, Section 2.

## FORFEITURE
### (18 U.S.C. § 982)

1.  The allegations contained in Counts 1-7 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2.  Upon conviction of any of the Counts, as alleged in this Indictment, the defendants, **ROGELIO RODRIGUEZ** and **RAYMOND ADAY** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense pursuant to Title 18, United States Code, Section 982(a)(7). The property subject to forfeiture includes but is not limited to:

A.  Bank Accounts

1.  Bank of America #003763038044 (Caring Nurse Home Health Corp.)

2.  Bank of America #898040455979 (Caring Nurse Home Health Corp.)

3.  Bank of America # 22902061534 (Caring Nurse Home Health Corp.)

4.    Eastern Financial Credit Union # 9345523603 (Rogelio Rodriquez and Josefina Rodriquez)

5.    Bank of America #229028591615 (Rogelio Rodriquez)

6.    JP Morgan Chase #0922120225 (Raymond Aday)

B.    <u>Money Judgment</u>

1.    The sum that constitutes the gross proceeds the Defendants derived from the offenses alleged in this Indictment, which sum may be sought as a money judgment.

3.    If any of the property described above, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Sections 982(a)(7) and the procedures outlined in Title 21 United States Code, Section 853, as incorporated by Title 18 United States Code, Section 982(b)(1).

A TRUE BILL

_____

FOREPERSON

WIFREDO A. FERRER
UNITED STATES ATTORNEY

SAM SHELDON
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JOSEPH S. BEEMSTERBOER
SENIOR TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

-18-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|
| vs. | |
| ROGELIO RODRIGUEZ and RAYMOND ADAY, | **CERTIFICATE OF TRIAL ATTORNEY\*** |
| _____ Defendants. / | **Superseding Case Information:** |

**Court Division:** (Select One)

New Defendant(s)     Yes _____ No _____
Number of New Defendants
Total number of counts _____

| X | Miami | ____ | Key West |
|---|---|---|---|
| ____ | FTL | ____ | WPB | ____ | FTP |

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:     (Yes or No)       Yes___
    List language and/or dialect     Spanish_____

4.  This case will take ___10___ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)                                        (Check only one)

| I | 0 to 5 days | ____ | Petty | ____ |
|---|---|---|---|---|
| II | 6 to 10 days | X | Minor | ____ |
| III | 11 to 20 days | ____ | Misdem. | ____ |
| IV | 21 to 60 days | ____ | Felony | X |
| V | 61 days and over | ____ | | |

6.  Has this case been previously filed in this District Court? (Yes or No)     No___
    If yes:
    Judge: _____     Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?     (Yes or No)     No___
    If yes:
    Magistrate Case No. _____
    Related Miscellaneous numbers: _____
    Defendant(s) in federal custody as of _____
    Defendant(s) in state custody as of _____
    Rule 20 from the _____     District of _____

    Is this a potential death penalty case? (Yes or No)     No___

7.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? _____ Yes     X_____ No

8.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007? _____ Yes     X_____ No

_____
JOSEPH BEEMSTERBOER
DEPARTMENT OF JUSTICE TRIAL ATTORNEY
Court No.6280961-Illinois

\*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** **ROGELIO RODRIGUEZ**

**Case No:**

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty:**        Ten (10) years' imprisonment

Count #: 2

Conspiracy to Pay Health Care Kickbacks

Title 18, United States Code, Section 371

**\*Max. Penalty:**        Five (5) years' imprisonment

Counts #: 3-7

Payment of Kickbacks in Connection with Federal Health Care Benefit Program

Title 42, United States Code, Section 1320a-7b(b)(2)(A)

**\*Max. Penalty:**        Five (5) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** RAYMOND ADAY

**Case No:**

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty:**      Ten (10) years' imprisonment

Count #: 2

Conspiracy to Pay Health Care Kickbacks

Title 18, United States Code, Section 371

**\*Max. Penalty:**      Five (5) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**